# ORIGINAL

**EXHIBIT**
**A**

### IN THE COURT OF COMMON PLEAS
### HAMILTON COUNTY, OHIO
### CIVIL DIVISION



D111657979 1N1

|  |  |
|---|---|
| **PAUL BAKER** | : |
| **& KIMBERLY BAKER** | : |
| 14 Piccadilly Drive | : |
| Hamilton, OH 45013 | : |
|  | : |
|  | : Case No.   A 1 5 0 4 4 6 4 |
|  | : |
|  | : Judge: |
|  | : |
| **Plaintiffs,** | : **COMPLAINT** |
|  | : **& JURY DEMAND** |
|  | : |
| **v.** | : |
|  | : |
| **ABUBAKAR ATIQ DURRANI, M.D.** | : |
| (Served by Hague Convention) | : |
|  | : |
| And | : |
|  | : |
| **CENTER FOR ADVANCED SPINE** | : **(ALL NEW DR. DURRANI** |
| **TECHNOLOGIES, INC.** | : **CASES SHALL GO TO JUDGE** |
| 6905 BURLINGTON PIKE | : **RUEHLMAN PER HIS ORDER)** |
| FLORENCE, KY 41042 | : |
|  | : |
| (Serve via Hague Convention) | : |
|  | : |
| And | : |
|  | : |
| **TRIHEALTH, INC., F/D/B/A** | : |
| **"Good Samaritan Hospital"** | : |
| 619 Oak Street | : |
| Cincinnati, Ohio 45206 | : |
|  | : |
| Serve: | : |
|   Donna S. Nienaber | : |
|   619 Oak Street | : |
|   Cincinnati, Ohio 45206 | : **REGULAR MAIL WAIVER** |
|  | : |
| **Defendants.** | : |

2015 AUG 19 A 9 42
CLERK OF COURTS
HAMILTON COUNTY, OH
**FILED**

Come now Plaintiffs, Paul and Kimberly Baker, and file this Complaint and jury

1

demand, stating as follows:

1. At all times relevant, Paul and Kimberly Baker ("Plaintiff" or "Plaintiffs") were residents of and domiciled in the State of Ohio.

2. At all times relevant, Defendant Dr. Abubakar Atiq Durrani ("Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3. At all times relevant, Center for Advanced Spine Technologies, Inc. ("CAST") was licensed to and did in fact perform medical services in the State of Ohio and Kentucky, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4. At all times relevant, TriHealth, Inc., formerly doing business as Good Samaritan Hospital ("Good Sam") was authorized to transact business and perform medical services in the State of Ohio and operate under the trade name Good Samaritan Hospital.

5. At all times relevant herein, Good Sam held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

6. The amount in controversy exceeds the jurisdictional threshold of this Court.

7. The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.  This Court is thus the proper venue to grant Plaintiff the relief sought.

8. This case has been previously 41(A) voluntarily dismissed and now is being re-filed.

## FACTUAL ALLEGATIONS OF PLAINTIFF

9.      In or around the year of 2008, Plaintiff visited Dr. Durrani for lower back pain that radiated a burning sensation down his legs.

10.     At his first visit with Dr. Durrani at CAST, on March 5, 2009, Dr. Durrani ordered an MRI.

11.     At the second visit Dr. Durrani recommended surgery.

12.     Dr. Durrani did not recommended any conservative treatment before surgery.

13.     On April 6, 2009, Dr. Durrani preformed a Microdisectomy, on the Plaintiff, from at L5–S1 region at Good Sam.

14.     Upon information and belief, Dave Rattigan, Medtronic representative, was present in the surgical suite during the surgery.

15.     Upon information and belief, Dr. Durrani preformed an unnecessary surgery on the Plaintiff.

16.     After surgery, Plaintiff followed up with Dr. Durrani at CAST and Good Sam for regular post-op visits and an emergency visit for an incision infection Plaintiff developed.

17.     Further, after his surgery, Plaintiff developed a new pain in his back. Specifically, Plaintiff began experiencing difficulty moving, bending, and walking.

18.     Plaintiff indicated his new, severe pain to Dr. Durrani at a post-op visit. Dr. Durrani merely told Plaintiff that he had to work through the pain and that it would just take time for Plaintiff to heal.

19.     Further, Dr. Durrani recommended Plaintiff undergo two more surgeries in order to alleviate his pain and improve his condition—Plaintiff, however, refused.

3

20.     At a visit with Dr. Durrani on March 1, 2012, Dr. Durrani informed Plaintiff that he had four level lumbar disk herniation at L2-L3; L3-L4; L4-L5; and L5-S1. (See exhibit A)

21.     However, the Radiology report, from February 27, 2012, shows that there was multilevel discogenic changes with herniation at L5-S1 to the Plaintiff's spine, which is different than what Dr. Durrani reported to the Plaintiff. (See exhibit B)

22.     Currently, Plaintiff experiences severe lower back pain, which radiates down his legs; left hip pain; leg pain, tingling, and numbness; and lastly, arm pain and numbness.

23.     Further, Plaintiff currently undergoes physical therapy to help with his pain.

24.     Plaintiff underwent two lumbar injections with no relief of his back pain.

25.     Since surgery, Plaintiff has had to change his employment; Plaintiff is unable to preform the tasks required in his profession.

26.     Due to Plaintiffs lack of income Plaintiff had to file for Bankruptcy.

27.     Plaintiff is not able to play with his children.

28.     Plaintiff can no longer travel, as he wished to do, because Plaintiff is unable to sit for extended periods of time.

29.     Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

30.     As a direct and proximate result of this surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

4

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND
## DEPOSITION TESTIMONY

31.    This information is to demonstrate the overall negligence and inappropriate

actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual

capacity.

32.    Krissy Probst was Dr. Durrani's professional and personal assistant handling

professional, academic, travel, surgery scheduling, his journals, his Boards, his

credentialing, his personal affairs and his bills.

33.    Krissy Probst worked as Dr. Durrani's assistant for three years at Children's

Hospital from 2006, 2007, and 2008.

34.    Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at

Children's for his having an affair with Jamie Moor, his physician assistant.

35.    Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three

other surgeons in the Orthopedic Department.

36.    Krissy Probst worked in the Orthopedic Department for eleven years from 2002-

2013. She retired in May, 2013.

37. Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

38. According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr.

Durrani "like a son."

39. According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's

unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani

faced.

5

40. Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

41. Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

42. At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

43. Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

44. Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

45. Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

46. Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

47. Dr. Durrani would schedule two to three spine surgeries a day at Children's.

48. Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

49. Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

6

50. Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

51. There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

52. Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

53. Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

54. Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

55. Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

56. Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

57. Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

58. While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

59. Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

60. Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

61. Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

62. On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

## DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

63. Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

64. Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

65. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all

8

damages requested in the Prayer for Relief.

## COUNT II: BATTERY

66. Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and by the failure to provide this information to Plaintiff.

67. Plaintiff would not have agreed to the surgeries if they knew the surgeries was/were unnecessary, not approved by the FDA, and not indicated.

68. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

69. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

70. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

71. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with his surgeries and procedures.

72. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

73. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

74. Dr. Durrani's conduct as described above was intentional and reckless.

75. It is outrageous and offends against the generally accepted standards of morality.

76. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

77. Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

78. Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

79. These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo his surgery.

80. Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

81. Dr. Durrani made the misrepresentations before, during and after the surgeries with the intent of misleading Plaintiff and their insurance company into relying upon them.

10

Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

82. The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

83. Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

84. As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

<div align="center">

**COUNT VI: SPOLIATION OF EVIDENCE**

</div>

85. Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

86. Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

87. Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

<div align="center">

**CAST COUNTS:**

**COUNT I: VICARIOUS LIABILITY**

</div>

90. At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

<div align="center">

11

</div>

91.     Dr. Durrani is in fact, the owner of CAST.

92.     Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

93. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

94. Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

95. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT II: NEGLIGENT HIRING, RETENTION & SUPERVISION

96. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

97. CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

98. The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

99. Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained and supervised Dr. Durrani.

100.    As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: FRAUD

101. Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that CAST hospital falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

102. The bills were sent to Plaintiff's insurance provider with the knowledge of CAST that in fact Plaintiff's surgery was not appropriately billed and documented and that the services rendered at Christ Hospital associated with Dr. Durrani were not appropriate.

103. The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

104. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

105. As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

106. CAST also concealed from Plaintiff that they knew about Dr. Durrani, including the misrepresentation to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

107. CAST's concealments and misrepresentations and the nature and risks of Plaintiff's surgery were material facts.

108. Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

109.    CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Christ Hospital.

110.    Upon information and belief, Plaintiffs believe that CAST continued to bill Plaintiff for unnecessary procedures and treatments that were unnecessary due to Plaintiff's condition after the surgery, which is evidenced by statements made by Dr. Durrani that she was one of those people who did not receive pain relief from his surgery, yet he continued to treat Plaintiff.

111.    Plaintiff is still awaiting billing from CAST reflecting the exact totals charged in Plaintiff's surgery.

112.    As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

113.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

114.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

115.    CAST omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and concealments as set forth herein.

116.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

117.    CAST was fully aware of its actions.

118.    CAST was fully aware that Plaintiff was induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiff.

14

119. Had Plaintiff been aware that CAST's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

120. CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

121. CAST's actions were not the result of any bona fide errors.

122. As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

    a. Loss of money paid

    b. Severe aggravation and inconveniences

    c. Under O.R.C. 1345.01 Plaintiff is entitled to:

        i. An order requiring CAST restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

        ii. All incidental and consequential damages incurred by Plaintiff;

        iii. All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

        iv. Such other and further relief that this Court deems just and appropriate.

**COUNT V: SPOLIATION OF EVIDENCE**

123. CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

124. CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

15

125.    CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## GOOD SAMARITAN HOSPITAL COUNTS:

### COUNT I: NEGLIGENCE

126.    Good Samaritan Hospital owed their patient, Plaintiffs, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

127.    Good Samaritan Hospital acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiffs, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgery and improper follow up care addressing a patient's concerns.

128.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents, and other hospital personnel who participated in Plaintiff's surgery.

129.    The management, employees, nurses, technicians, agents, and all staff during the scope of their employment and/or agency of Good Samaritan Hospital's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op

16

evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of Good Samaritan Hospital.

130.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of Good Samaritan Hospital, Plaintiffs sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

131.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

132.    Good Samaritan Hospital negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

> a.  Allowing Dr. Durrani to repeatedly violate the Good Samaritan Hospital bylaws with it's full knowledge of the same;
>
> b.  Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at Good Samaritan Hospital;
>
> c.  Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Good Samaritan Hospital staff, doctors, Dr. Durrani's patients and by others;
>
> d.  Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals,

17

including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

133. The Safe Medical Device Act required entities such as Good Samaritan Hospital to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

134. As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: FRAUD

135. Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that Good Samaritan falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

136. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for Good Samaratain's services in association with Dr. Durrani's surgeries.

137. These bills constituted affirmative representations by Good Samaritan Hospital that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

138. The bills were sent with the knowledge of Good Samaritan Hospital that in fact Plaintiff's surgery was not appropriately billed and documented and that the services

18

rendered at Good Samaritan Hospital associated with Dr. Durrani were not appropriate.

139. The bills sent by Good Samaritan Hospital to Plaintiff falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

140. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for Good Samaritan Hospital's services in association with Dr. Durrani's surgeries.

141. As a direct and proximate result of this reliance on the billing of Good Samaritan Hospital, Plaintiff incurred medical bills that he otherwise would not have incurred.

142. Upon information and belief, Good Samaritan Hospital's helped concealed and misrepresented information about the Plaintiff's surgery and this information was a material facts.

143. Because of its superior position and professional role as a medical service provider, Good Samaritan Hospital had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

144. Good Samaritan Hospital intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgery and procedures Dr. Durrani performed on Plaintiff at Good Samaritan Hospital.

19

145.    As a direct and proximate result of the fraud upon Plaintiff by Good Samaritan

Hospital, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT IV: SPOLIATION OF EVIDENCE

146.    Good Samaritan Hospital through its agents and employees, willfully altered,

destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records,

emails, billing records, paperwork and related evidence.

147.    Good Samaritan Hospital through its agents and employees, spoiled evidence with

knowledge that there was pending or probable litigation involving Plaintiff.

148.    Good Samaritan Hospital's conduct was designed to disrupt Plaintiff's potential

and/or actual case, and did in fact and proximately cause disruption, damages and

harm to Plaintiff.

### COUNT V: OHIO CONSUMER SALES PROTECTION ACT

149.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq.

exempts physicians, a transaction between a hospital and a patient/consumer is not

clearly exempted.

150.    Good Samaritan Hospital's services rendered to Plaintiff constitute a "consumer

transaction" as defined in ORC Section 1345.01(A).

151.    Good Samaritan Hospital omitted suppressed and concealed from Plaintiff facts

with the intent that Plaintiff rely on these omissions, suppressions and concealments

as set forth herein.

152.    Good Samaritan Hospital's misrepresentations, and its omissions, suppressions

and concealments of fact, as described above, constituted unfair, deceptive and

unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

153. Good Samaritan Hospital was fully aware of its actions.

154. Good Samaritan Hospital was fully aware that Plaintiff was induced by and relied upon Good Samaritan Hospital's representations at the time Good Samaritan Hospital was engaged by Plaintiff.

155. Had Plaintiff been aware that Good Samaritan Hospital's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

156. Good Samaritan Hospital, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

157. Good Samaritan Hospital's actions were not the result of any bona fide errors.

158. As a result of Good Samaritan Hospital's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

    a. Loss of money paid

    b. Severe aggravation and inconveniences

    c. Under O.R.C. 1345.01 Plaintiff is entitled to:

        i. An order requiring Good Samaritan Hospital restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

        ii. All incidental and consequential damages incurred by Plaintiff;

      iii.   All reasonable attorneys' fees, witness fees, court costs and other

          fees incurred;

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.      Past medical bills;

2.      Future medical bills;

3.      Lost income and benefits;

4.      Lost future income and benefits;

5.      Loss of ability to earn income;

6.      Past pain and suffering;

7.      Future pain and suffering;

8.      Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.      Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10.    All incidental costs and expenses incurred as a result of their injuries;

11.    The damages to their credit as a result of their injuries;

12.    Punitive damages;

13.    Costs;

14.    Attorneys' fees;

15.    Interest;

16.    All property loss;

17.    All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

<div style="margin-left:50%;">

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay L. Boese (0091307)
*Attorney for Plaintiff*
5247 Madison Pike
Independence, KY 41051
859-363-1900
Fax: 859-363-1444

</div>

## JURY DEMAND

Plaintiff makes a demand for a jury under all claims.

<div style="margin-left:50%;">

Matthew Hammer (0092483)
Lindsay L. Boese (0091307)

</div>





# C A S T
## Center *for* Advanced SPINE Technologies

March 1, 2012

Brandon Zoller, M.D.
3187 Western Row Rd
Mainville, OH 45039

**RE:** PAUL BAKER
**DOB:** December 15, 1970

Dear Dr. Zoller:

**DIAGNOSIS:**

1. Status post L5-S1 microdiskectomy, hemilaminectomy right sided in April, 2009 because of radicular pain in the right lower extremity.
2. Failure of foraminal injection to resolve the pain.

Thank you for asking me to evaluate Paul. Paul is here today for repeat evaluation. We got the MRI of the lumbar spine. The MRI of the lumbar spine shows he has four level lumbar disk herniation at L2-L3, L3-L4, L4-L5 and L5-S1. At L2-L3 it is the left foramina that is blocked, at L3-L4 both foramina are blocked, at L4-L5 both foramina are blocked, at L5-S1 the right foramina is blocked. At this point his symptoms are all in the L5 distribution. He has a positive SLR on the right side, a positive Lasegue test on the right side and definitely has L5 sensory paresthesias.

**IMPRESSION:**

1. Lumbar spinal stenosis associated with lumbar spondylolisthesis.
2. Multiple level lumbar disk herniation at L2-L3, L3-L4, L4-L5 and L5-S1.
3. Right sided foraminal stenosis L5-S1.
4. Bilateral foraminal stenosis L4-L5.
5. Bilateral foraminal stenosis L3-L4.

Baker, Paul (MRNE1941398)

| | |
|---|---|
| FORT HAMILTON HOSPITAL | *Kettering Health Network* |
| | *Medical Imaging Report* |

**Baker, Paul**                    41 year old 12/25/1970 Male        MRN: E1941398
                                                                     Auth MD: Abubakar A Durrani
Exam Date/Time:              Exam:                                    Accession Number:
**02/27/2012 1053**          **MRI-Lumbar Spine Wo Contrast**        MR-12-0090687

MRI OF THE LUMBAR SPINE WITHOUT CONTRAST

HISTORY: Back pain

TECHNICAL FACTORS: Noncontrast standard protocol imaging was performed of the lumbar spine.

FINDINGS:

There is normal alignment of the visualized vertebrae with no evidence of acute fracture or traumatic subluxation.

No abnormal marrow signal is seen to suggest metastatic disease.

No abnormal signal is seen in the visualized spinal cord.

At L2-3, there is left paracentral protrusion or herniation resulting in moderate narrowing of the left-sided canal with narrowing at the entrance of the left neural foramen.

At L3-4 there is broad-based disc bulge and facet changes resulting in moderate canal stenosis with mild to moderate bilateral foraminal narrowing, left greater than right.

At L4-5 there is broad-based disc bulge and facet changes resulting in moderate to severe canal stenosis with moderate bilateral foraminal narrowing.

At L5-S1 there is broad-based central and right paracentral disc herniation resulting in moderate to severe canal stenosis with possible impingement of the S1 nerve root in the lateral recess and narrowing at the entrance of the L5 neural foramen.

IMPRESSION:

Multilevel discogenic changes with herniation at L5-S1 as above.

Electronically Signed by: Tom Nogueira, MD

Signed By: THOMAS NOGUEIRA on Mon Feb 27, 2012 11:13:00 AM EST

375 Dixmyth Avenue
Cincinnati, OH 45220475

**DataArk®**

## Account Transactions

| Patient's Name | SSN# | Account #: | Admit Date | Discharge Date |
|---|---|---|---|---|
| BAKER, PAUL J R | 282689461 | V100297773691 | 4/6/2009 | 4/7/2009 |
| Patient's Address | | Patient's City | Patient's State | Patient's Zip |
| 925 MILLERS RUN CT, PAUL J R | | HAMILTON | OH | 45011 |

| Tx Code | Description | Qty | Amount | Tx Date | Post Date | Dept | Batch No | Rev Code | HCPC | CPT4 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1111603 | SEMI PRIVATE ROOM (PRIV) | 1 | $890.00 | 4/6/2009 | 4/6/2009 | 5010.1320 | 807 | 0111 | | |
| 1113011 | PRIV DIFF PATIENT REQ | 1 | $27.00 | 4/6/2009 | 4/6/2009 | 5010.1320 | 807 | 111X | | |
| 2511514 | CEFAZOLIN /D5W 50ML 1G MGP | 1 | $25.84 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0636 | J0690 | |
| 2512834 | LACTATED RINGERS 1000ML SOL | 1 | $40.00 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0636 | J7120 | |
| 2512834 | LACTATED RINGERS 1000ML SOL | 1 | $40.00 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0636 | J7120 | |
| 2512915 | LIDOCAINE 2% 10MLAMP | 1 | $4.20 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |
| 2513260 | MORPHINE PCA 30MG/30ML | 1 | $37.68 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0636 | J2270 | |
| 2513454 | ONDANSETRON 4MG/2ML VIAL | 1 | $72.15 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0636 | J2405 | |
| 2513883 | PROPOFOL 200MG 20ML AMP | 2 | $79.74 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |
| 2514024 | ROCURONIUM 10MG/ML | 1 | $49.92 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |
| 2514183 | SUCCINYL CHL 200MG/10ML VIAL | 1 | $11.64 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0636 | J0330 | |
| 2515260 | LIDOCAINE 4% LTA KIT | 1 | $24.12 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |
| 2515402 | CEFAZOLIN 1G DUPLEX BAG | 1 | $49.35 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |

375 Dixmyth Avenue

Cincinnati, OH 45202475

| Patient's Name | | SSN# | Account #: | | Admit Date | | Discharge Date | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BAKER, PAUL J R | | 282689461 | VI002973691 | | 4/6/2009 | | 4/7/2009 | | | |
| Patient's Address | | | Patient's City | | Patient's State | | Patient's Zip | | | |
| 925 MILLERS RUN CT, PAUL J R | | | HAMILTON | | OH | | 45011 | | | |

## Account Transactions

| Tx Code | Description | Qty | Amount | Tx Date | Post Date | Dept | Batch No | Rev Code | HCPC | CPT4 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2515402 | CEFAZOLIN 1G DUPLEX BAG | 1 | $49.35 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |
| 2515427 | BUPIVACAINE 0.5% 30ML VIAL | 1 | $26.12 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0251 | | |
| 2591789 | CYCLOBENZA. 10MG TAB | 1 | $1.20 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0259 | | |
| 2592923 | LIDOCAINE 2% JELLY | 1 | $63.75 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0259 | | |
| 2593099 | METHOCARB. 750MG TAB | 1 | $2.35 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0259 | | |
| 2594353 | THROMBIN 5000 UNIT | 1 | $153.52 | 4/6/2009 | 4/6/2009 | ****.2160 | 810 | 0259 | | |
| 2597050 | ALBUTEROL 0.5ML (2.5 MG) | 1 | $2.00 | 4/6/2009 | 4/6/2009 | ****.3400 | 809 | 0259 | | |
| 2708010 | O2 INTERMITTENT IN PACU(MAIN) | 1 | $128.00 | 4/6/2009 | 4/6/2009 | ****.3400 | 809 | 0270 | | |
| 2726378 | GUIDEWIRE ORTHO/NEURO | 1 | $186.00 | 4/6/2009 | 4/7/2009 | ****.3490 | 745 | 0272 | C1713 | |
| 2726413 | SUTURE | 25 | $550.00 | 4/6/2009 | 4/7/2009 | ****.3490 | 745 | 0272 | | |
| 2726427 | TIP MIDAS MEDMEX REX | 1 | $236.00 | 4/6/2009 | 4/7/2009 | ****.3490 | 745 | 0272 | | |
| 3000199 | VENIPUNCTURE STATISTIC | 1 | $0.00 | 4/6/2009 | 4/6/2009 | ****.3420 | 809 | 0300 | | |
| 3200901 | SPINE LUMBAR XR LATERAL 1VIEW | 1 | $180.00 | 4/6/2009 | 4/6/2009 | ****.2220 | 808 | 0320 | | 72020 |

DataArk®

375 Dixmyth Avenue
Cincinnati, OH 45202

| Patient's Name | SSN# | Account #: | Admit Date | Discharge Date |
|---|---|---|---|---|
| BAKER, PAUL J R | 282689461 | VI0029773691 | 4/6/2009 | 4/7/2009 |

| Patient's Address | Patient's City | Patient's State | Patient's Zip |
|---|---|---|---|
| 925 MILLERS RUN CT, PAUL J R | HAMILTON | OH | 45011 |

## Account Transactions

| Tx Code | Description | Qty | Amount Tx Date | Post Date | Dept | Batch No | Rev Code | HCPC | CPT4 |
|---|---|---|---|---|---|---|---|---|---|
| 3600200 | FIRST 15 MINUTES SURG COMPLEX | 1 | $4,122.00 4/6/2009 | 4/7/2009 | ****, 3690 | 745 | 0360 | | |
| 3600405 | MINUTE CHARGE COMPLEX | 82 | $5,002.00 4/6/2009 | 4/7/2009 | ****, 3490 | 745 | 0360 | | ✓ |
| 3600408 | STAFF IN ROOM | 3 | $0.00 4/6/2009 | 4/7/2009 | ****, 3490 | 745 | 0360 | | |
| 3700325 | ANESTHESIA COMPLEX | 1 | $3,416.00 4/6/2009 | 4/7/2009 | ****, 3490 | 745 | 0370 | | |
| 4101544 | INCENTIVE SPIROMETER TRMT | 1 | $61.00 4/6/2009 | 4/6/2009 | ****, 3400 | 809 | 0410 | | 94640 |
| 4106797 | *HAND HELD NEBULIZER TX INIT | 1 | $61.00 4/6/2009 | 4/6/2009 | ****, 3400 | 809 | 0410 | | 94640 |
| 7100007 | SDS LEVEL 2 | 1 | $445.00 4/6/2009 | 4/6/2009 | ****, 3420 | 809 | 0710 | | |
| 7100053 | 1ST 15 MINUTES PACU | 1 | $1,300.00 4/6/2009 | 4/6/2009 | ****, 3280 | 809 | 0710 | | |
| 7100054 | MINUTE RECOVERY INTENSE | 64 | $1,920.00 4/6/2009 | 4/6/2009 | ****, 3280 | 809 | 0710 | | |
| 2511514 | CEFAZOLIN /D5W 50ML 1G NGP | 1 | $25.84 4/7/2009 | 4/7/2009 | ****, 2160 | 756 | 0636 | J0690 | |
| 2513260 | MORPHINE PCA 30MG/30ML | 1 | $37.68 4/7/2009 | 4/7/2009 | ****, 2160 | 756 | 0636 | J2270 | |
| 2513260 | MORPHINE PCA 30MG/30ML | 1 | $37.68 4/7/2009 | 4/7/2009 | ****, 2160 | 756 | 0636 | J2270 | |
| 2514076 | SOD CL 0.9%/KCL 20MEQ 1000ML | 1 | $51.00 4/7/2009 | 4/7/2009 | ****, 2160 | 756 | 0251 | | |

DataArk®

375 Dixmyth Avenue

Cincinnati, OH 45202475

| Patient's Name | | SSN# | Account #: | | Admit Date | | Discharge Date | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BAKER, PAUL J R | | 282689451 | V10029773691 | | 4/6/2009 | | 4/7/2009 | | | |
| Patient's Address | | | Patient's City | | Patient's State | | Patient's Zip | | | |
| 925 MILLERS RUN CT, PAUL J R | | | HAMILTON | | OH | | 45011 | | | |

**Account Transactions**

| Tx Code | Description | Qty | Amount | Tx Date | Post Date | Dept | Batch No | Rev Code | HCPC | CPT4 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2591789 | CYCLOBENZA. 10MG TAB | 1 | $1.20 | 4/7/2009 | 4/7/2009 | ****.2160 | 756 | 0259 | | |
| 2592075 | DOCUSATE-SENNA TAB | 2 | $4.00 | 4/7/2009 | 4/7/2009 | ****.2160 | 756 | 0259 | | |
| 2593099 | METHOCARB. 750MG TAB | 1 | $2.35 | 4/7/2009 | 4/7/2009 | ****.2160 | 756 | 0259 | | . |
| 2593099 | METHOCARB. 750MG TAB | 1 | $2.35 | 4/7/2009 | 4/7/2009 | ****.2160 | 756 | 0259 | | |
| 2593099 | METHOCARB. 750MG TAB | 1 | $2.35 | 4/7/2009 | 4/7/2009 | ****.2160 | 756 | 0259 | | |
| 2593485 | OXYCOD/ACET 5/325 TAB | 1 | $5.60 | 4/7/2009 | 4/7/2009 | ****.2160 | 756 | 0259 | | |
| 4101544 | INCENTIVE SPIROMETER TRMT | 1 | $61.00 | 4/7/2009 | 4/7/2009 | ****.3400 | 755 | 0410 | | 94640 |
| A | AMERIGROUP COMM CARE C/A | | ($13,668.43) | 4/12/2009 | 4/12/2009 | 2 | | | | |
| R | AMERIGROUP COMM CARE PAYMENT | | ($5,792.55) | 5/6/2009 | 5/6/2009 | 553 | | | | |
| X | | | $27.00 | 7/27/2009 | 7/27/2009 | 57 | | | | |
| X | | | $0.00 | 9/18/2009 | 9/18/2009 | 308 | | | | |
| X | | | $0.00 | 11/16/2009 | 11/16/2009 | 438 | | | | |
| A | BD DBT/UNCOL CLOSEBACK | | ($27.00) | 2/8/2010 | 2/8/2010 | 658 | | | | |

DataArk®

375 Dixmyth Avenue
Cincinnati, OH 45202475

## Account Transactions

| Patient's Name | | SSN# | Account #: | Admit Date | Discharge Date |
|---|---|---|---|---|---|
| BAKER, PAUL J R | | 282689461 | V10029773691 | 4/6/2009 | 4/7/2009 |
| Patient's Address | | | Patient's City | Patient's State | Patient's Zip |
| 925 MILLERS RUN CT, PAUL J R | | | HAMILTON | OH | 45011 |

| Tx Code | Description | Qty | Amount | Tx Date | Post Date | Dept | Batch No | Rev Code | HCPC | CPT4 |
|---|---|---|---|---|---|---|---|---|---|---|
| X | | | $0.00 | 4/7/2010 | 4/7/2010 | 18 | | | | |

| | |
|---|---|
| Account Balance | $27.00 |
| Total Charges | $19,487.98 |
| Total Payments | $5,792.55 |
| Total Adjustments | $13,695.43 |
| Total Refunds | $0.00 |

DataArk®

Patient Name _Baker, Paul._

| Hosp | # Surg | DOSurg | DSurgDic | Days lat | DODisch | DDishDic | Days lat |
|------|--------|--------|----------|----------|---------|----------|----------|
| GSH | 1 2 3 | 4/6/09 | 4/6/09 | microdisk | L5-S1 | | |

| Durrani proposed surgery | Actual Surgery done |
|--------------------------|---------------------|
| | |

| Complic | UnNSurg | Quest Dx |
|---------|---------|----------|
| | | |

No sig
good job —
No detail

| NovelSurg | Biolog | Loose HW | Consent | Shanti | Misc |
|-----------|--------|----------|---------|--------|------|
| | | | | | |

3/13/09 MRI LS spine
"L5-S1 Broad based (R) paracentral/foraminal disc hern. an
disc osteophyte complex → mod central mild (L) mod (R) FS
questionable (R) L5 NR impingment "

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO
CIVIL DIVISION

|  |  |  |
|---|---|---|
| PAUL BAKER, et. al. | : | |
| | : | Case No. |
| | : | |
| Plaintiff, | : | Judge: |
| | : | |
| | : | |
| v. | : | **MOTION FOR EXTENSION OF TIME** |
| | : | **TO FILE AFFIDAVIT OF MERIT** |
| | : | |
| ABUBAKAR ATIQ DURRANI, M.D., et al | : | |
| | : | |
| | : | |
| Defendants. | : | |

Come now Plaintiffs, through Counsel, and file this Motion for an Extension of Time for 90 days to file an Affidavit of Merit in support of Plaintiff's medical negligence claim.

Notably, Plaintiff's claims related to Billing Fraud, Battery, Spoliation of Evidence, Intentional Infliction of Emotional Distress do not require an affidavit of merit.

Furthermore, this case was filed, inter alia, to preserve all applicable statutes of limitation. Therefore, the Plaintiff respectfully requests a brief opportunity to acquire all relevant medical records, billing, and radiology imaging files, and have Plaintiff's retained expert medical consultants review the records.

Based on the other substantially similar claims against Dr. Durrani, Plaintiffs' nurse consultant review, and the preliminary medical documents, the case is unquestionably supported by Ohio law.

**THEREFORE**, Plaintiffs respectfully request a ninety (90) day extension to file their affidavit of merit; an opportunity to be heard if the relief is not granted; and Court oversight in the medical records production, which have not been timely produced by Defendants, if necessary.

Respectfully submitted,

\s\Matthew Hammer

Matthew Hammer (0092483)
Lindsay L. Boese (0091307)
*Attorney for Plaintiff*
5247 Madison Pike
Independence, KY 41051
859-363-1900
Fax: 859-363-1444

# COURT OF COMMON PLEAS
# HAMILTON COUNTY, OHIO

FILED

2015 AUG 19 A 9:42

Paul Baker
CLERK OF COURTS
HAMILTON COUNTY, OH

REQUEST AND INSTRUCTIONS FOR ORDINARY MAIL SERVICE

## INSTRUCTIONS TO THE CLERK

CASE NUMBER: A 1 5 0 4 4 6 4

-vs-

Tri Health/Good Samaritan Hospital

**Defendant**

**IF SERVICE OF PROCESS BY CERTIFIED MAIL IS RETURNED BY THE POSTAL AUTHORITIES WITH AN ENDORSEMENT OF "REFUSED" OR "UNCLAIMED" AND IF THE CERTIFICATE OF MAILING CAN BE DEEMED COMPLETE NOT LESS THAN FIVE (5) DAYS BEFORE ANY SCHEDULED HEARING, THE UNDERSIGNED WAIVES NOTICE OF THE FAILURE OF SERVICE BY THE CLERK AND REQUESTS ORDINARY MAIL SERVICE IN ACCORDANCE WITH CIVIL RULE 4.6 (C) OR (D) AND CIVIL RULE 4.6 (E).**

## Matthew J. Hammer

**ATTORNEY OF RECORD          (TYPE OR PRINT)**

## \s\Matthew J. Hammer

**DATE**

**ATTORNEY'S SIGNATURE**

FILED

2015 AUG 19 A 9:42

~~TROY~~ FILLER
CLERK OF COURTS
HAMILTON CO, OH

**COMMON PLEAS COURT
HAMILTON COUNTY, OHIO**

Paul Baker & Kimberly Baker
_____

_____

**A 1 5 0 4 4 6 4**

CASE NO. _____

VS

Abubakar Atiq Durrani, MD, et al.
_____

_____

**WRITTEN REQUEST FOR SERVICE
TYPE OF PAPERS TO BE SERVED ARE**

Complaint & Motion For Extension of Time To File AOM
_____

( ) **PLEASE CHECK IF THIS IS A
DOMESTIC CASE**

**PLAINTIFF/DEFENDANT REQUESTS:**

**CERTIFIED MAIL SERVICE** X_____

**PERSONAL SERVICE** _____

**PROCESS SERVICE** _____

**EXPRESS MAIL SERVICE** _____

**REGULAR MAIL SERVICE** _____

**RESIDENCE SERVICE** _____

**FOREIGN SHERIFF** _____

ON **TRI HEALTH, INC Good Samaritan Hospital**
_____

Serve: Donna S Nienaber 619 Oak Street Cincinnati, Ohio 45206
_____

_____

_____

_____

_____

_____

_____

Matthew J. Hammer
_____

**ATTORNEY**

5247 Madison Pike Independence, KY 41051
_____

**ADDRESS**

859-363-1900
_____

**PHONE NUMBER**

92483
_____

**ATTORNEY NUMBER**